1 So.2d 749
### HASTINGS v. HUBER.
8 Div. 74.

Supreme Court of Alabama.
April 17, 1941.

R. B. Patton and D. U. Patton, both of Athens, for appellant.

162

Edw. Goodrich, of Athens, for appellee.

THOMAS, Justice

The appeal is from a decree of the probate court in the settlement of a guardianship. The decisions of this court are to the effect that a guardian is chargeable with any property of the ward which could have been received or recovered by the use of reasonable · diligence to that end—the diligence which a prudent man would exercise in the prosecution of his own like affairs. Sims v. Russell, 236 Ala. 562, 183 So. 862; Dumas v. Hollins, 228 Ala. 644, 154 So. 781; Hall v. Esslinger, 235 Ala. 451, 179 So. 639; Code of 1923, §§ 8149, 8170.

It is further a rule of evidence that when a guardian files a report to which exceptions as to the items thereof are reserved, the burden of establishing the right to the credit claimed devolves on such guardian. Bentley v. Dailey, 87 Ala. 406, 6 So. 274. The guardian must also prove the reasonable value of services for which credit is claimed. 28 Corpus Juris, p. 1221.

In Stewart v. McMurray, 82 Ala. 269, 3 So. 47, 48, Mr. Justice Stone thus states the rule: "A well-defined principle of law bears on the questions raised by this record. When a settling guardian or personal representative claims a credit for assets not reduced to possession, or for the payment of a claim preferred against the trust, and exception is filed to the allowance of the credit, the burden is on the guardian or personal representative, as the case may be, to prove the justness of his claim. That is, he must show that he employed due diligence to collect the demand, or to obtain possession of the property, for whose loss he asks credit, or he must show that diligence could have accomplished nothing. So, if the exception be that he improperly paid an alleged debt resting on the trust, he must at least show a prima facie case of liability. * * *" See also Ramsey v. McMillan, 214 Ala. 185, 106 So. 848.

There were no annual settlements of the guardianship here questioned and hence the rules as to annual or semiannual settlements of accounts of a guardian usually accepted and file in ex parte proceedings for the purpose of informing the court and interested parties and made where the ward is legally and usually incapable of protecting his own interests are not conclusive on the ward or person charged with the duty of protecting his interest and do not obtain. We note, in passing, that such settlements may be opened or reconsidered before, during, or after final settlement of the guardian's accounts, where proceedings are instituted within the time limits prescribed by the statutes. Code of 1923, § 8201 et seq.; Code of 1923, §§ 6482–6484, 8966.

In the case of the challenge of items of account when first presented by · the guardian, the burden of proof is upon him to establish, within the rules of evidence that obtain, the verity of the claim, or the reasonableness of the service for which claim is made; and, in the case of the challenge of annual settlements or items thereof, the

burden of proof is upon him who challenges the same. It is the former rule, as to the burden of proof, that is to be applied in the instant case. Cunningham v. Pool, 9 Ala. 615; May v. Duke, 61 Ala. 53; Radford's Adm'r v. Morris, 66 Ala. 283; Ashley's Adm'x v. Martin, 50 Ala. 537; Cunningham v. Cunningham, 215 Ala. 484, 111 So. 208; Note, 99 A.L.R. 996.

The foregoing will indicate the rules of law that obtain as to the several settlements between wards and guardians, and in this case the assignments of error are more than three hundred.

To an understanding of the facts presented by the record, it may be said that the ancestors left a young family of six children, of whom John was the eldest. This comparatively young man acted as guardian for his brothers and sisters, taking charge of the real estate and personal property and the operation of the farm. The record shows various items of expense as to purchase of household and kitchen furniture, farming implements and purchase of a few head of farm stock. There was a town house, $1,892.21 in cash, and a mortgage made by the ancestor that required foreclosure in order to obtain possession of the property covered by same; collecting of rents that a prudent management of the farm would require; and use of this income (from the sources enumerated above) educated, clothed, fed and provided for the younger brothers and sisters, including this contestant. John also provided for the contestant's marriage and turned over to her $125 in cash, one sixth of the real property, and her part of the farm, having a new house thereon erected by the guardian. The improvements made by the guardian, it is shown, increased the rental value of the farm as a whole fourfold and the contestant was given her choice of the personal property.

This court has held under a long line of authorities (recently collected in Childs v. Julian, 2 So.2d 453 [1]), that family settlements made without fraud and with a full understanding of the facts are favored and in proper cases enforced where real estate is divided pursuant thereto and possession delivered in accordance therewith. This view is indicated in the instant case when the court said:

"And it appearing to the court that the guardian, within his authority in the han-dling of the estate of his wards, exercised sound discretion, such as men of ordinary prudence and intelligence use in their affairs, and that he, while not as circumspect in all matters as he perhaps should have been, took care of funds and property of his wards to an advantage, notwithstanding many years of a great financial depression.

"And it appearing to the court that due notice of the time and nature of this settlement was given to Mabel Huber Hastings, and that each of the other said wards waived in writing all notice by law granted them of the hearing, and filed their agreements in this court that the hearing might be had without notice to them, and without any itemization of expenditures made in their behalf, and releasing the guardian from any and all liability by virtue of his tenure as guardian, and that all of said wards are over the age of twenty-one years, the court proceeds, after examining said account, and hearing proof in relation thereto to audit and pass upon said account.

"Whereupon it is found that the guardian has received in cash the sum of $5,001.31, and has justly expended in and about the costs and charges attendant upon said guardianship the sum of $4,833.44, leaving in his hands or to be accounted for by him $167.87, and due to the said wards the sum of $167.87 of which Mabel Huber Hastings is entitled to one-sixth, $27.98.

"It is therefore ordered, adjudged and decreed by the court that upon the payment of the last-mentioned sum to Mabel Huber Hastings said account be and the same is hereby in all things passed and allowed as above stated, and that the said guardian with his bondsman be and they are discharged from future liability as such; * * * *."

In Hall v. Esslinger, 235 Ala. 451, 179 So. 639, 644, a pertinent observation to this case is made, that: "For the sake of argument, let us assume that the guardian had made unauthorized loans and has not been as circumspect as he might have been in his management of the estate. We still believe that the rule of law applicable is that laid down in 28 Corpus Juris, p. 1143, paragraph 239, where it is said: 'Where the ward has suffered no actual loss, he has no right to recover damages from the guardian because the latter has made an unauthorized loan on real estate.' "

---

[1] Post, p. 249.

Computing the rent of the farm, house and interest received on mortgages, after payment of taxes, etc., there was a small surplus in favor of the wards, notwithstanding the increase of the value of the farm by reason of the enlarging of its production capacity. The evidence shows that the cultivatable lands were increased from about 35 to 115 acres.

The record shows a ratification of the accounts of this guardian by his younger brothers and sisters. That the contesting ward knew of his acts at the time and acquiesced in his methods of handling the estate is indicated by the following excerpts from the record:

"I was Mabel Huber before I married and one of the wards of John Joe Huber. My brothers and sister and I moved on the homeplace in May, 1926, after my mother died, and we stayed there in 1926 and in 1927, and until I married. We worked the farm in 1926 and in 1927. I stayed there on my vacations. There were between seventy and seventy-five acres of the Huber farm, or my homeplace, in cultivated land in 1926 and about the same in 1927, '28 and '29. I think Mike Brooks cleared about six acres of new ground around 1930 and in 1931 there would have been between seventy and eighty acres in cultivation. In 1932, '33 and '34 there was between seventy and eighty acres of land in cultivation on the farm. There was some new ground cleared around 1934, but I just don't remember how much it was. Counting all new ground, there was more than eighty acres in cultivation in 1935 and in 1936. There was around one hundred fifty to one hundred sixty acres in cultivation on the whole farm today.

"After we moved back to the farm all the children lived there together. All of us children did not go to school; John didn't go; the rest of us did. We went to Elkmont that Fall, and it was about six miles. We went to school in the Ford automobile part of the time and all of us children used it going to school. I went to school until 1928 and went to Elkmont both years. Most of the time we did not use the Ford automobile to go to school in. We went to school in my grandfather's car and my uncle Frank's car, and the Ford was at home at that time. Leo Hastings and I rented part of the land from John while he had it in his charge as guardian. While he was acting as guardian we did not divide up all of the personal property. I was married during the time John was guardian. I got a bed,

mirror, churn and machine. The piano is mine now, but I haven't got it as yet; it was a good piano. I asked them if I could have the piano and they said I could have it. They told me I wasn't going to get anything else and I haven't asked them for anything else. John didn't want me to get the bed I got, but I went and got it.

"We rented from John in 1931 and 1932 not in 1929 and '30. During all the time that I lived there the land was rented out and I saw that it was rented out each year. I saw the people that it was rented out to, and saw that they made pretty good crops and worked it pretty well. Leo and I made the best crop that we could and never made any objection to the method of handling the place. It suited us fine. I can remember a little about when my father was living; he died July 2, 1919. At that time a good deal of the land was in timber, but some of it was cleared, too. I would say that fifty acres of the land was cleared while he was living and at the time that my mother was in possession of the land I would say that between seventy and seventy-five acres were in cultivation and the rest was called woods land. * * * I asked John to account to me. For about six years I have been trying to get him to. I first asked him to account to me in 1936, which would be four years, and I have been begging him to ever since I was married. I had been married two years when I asked him about the rent. I sold him my interest in the Barbee land last Fall and my interest in the Starkey mortgage, and I was paid for it. He wrote me a check and I endorsed it and he cashed it and handed me the money. * * He told me that one time on November 11, 1938 (that there wasn't no money at all) but he told me that before 1938 also. In 1936 when he divided the land, he told me that at the homeplace. He told me that that was all the property there was. We divided the land in 1936 and every one of us went and took charge of their share of the land. * * * John loaned me some money before that time and I gave him a note. He told me at that time that he didn't have any money, but he told me that he would pay the note out of my part of the guardian's account. I never paid the note and he never did take it out of my guardian's account. * * *

"I gave my brother, John Joe Huber, $110.00 note for a mule and a $50.00 note for a stove. He told me that both of these notes would be paid for from my share of

the guardian's funds and as far as I know the notes have never been marked paid and I don't know whether he paid himself out of the guardianship funds or not."

Contestant further said that she asked the guardian to account to her in 1936; that they then divided the land and every one of the children went and took charge of their share of the place; that the guardian did loan her some money and that she gave him a note; that he told her he didn't have any money and she never paid that note nor has she paid the note of $110 for a mule and $50 for a stove; that she is not informed as to whether these notes were discharged by proper accounts in the guardianship.

In Spence v. Spence et al., 239 Ala. 480, 195 So. 717, 720, the fact is adverted to that the joint tenants knew of the action of the other in spending rents from the real estate and no protest was made. Therein it is also said that: "The farm land had been in possession and management of those heirs for fifteen years. The only three living children of decedent, Robert L. Spence, Janie Spence and Mary Brooks, all very old and feeble, occupied the house in town until the two ladies died, leaving Robert L. Spence, eighty-four years old, as its occupant. No claim is made for compensation for their occupancy. Charles and Morgan Spence managed the land, collected its income, paid the taxes, upkeep, repairs, etc., and furnished some of the necessary supplies to the three old people mentioned, and paid the funeral expenses of the two sisters when they died. This had been going on throughout their possession of the land. Most of the heirs consented to this arrangement, and all acquiesced in it."

It will be noted of the Spence case that the operators of the farm were trustees and not guardians. In the present case the guardian was an older brother and joint tenant in the property dealt with. Under the family settlement made in 1936, contestant accepted the division of the real estate as her portion of the land on which improvements had been made. She had been told for a period of years, after her coming of age, that there were no further moneys coming to her.

The decision in Jones' Appeal, 8 Watts & S., Pa., 143, 42 Am.Dec. 282, 288, is clearly in point and we quote the concluding portion of that opinion: "The principle of accountability for the omission of every measure of imaginary precaution which human sagacity might have foreseen would be impracticable in a country where counsel cannot be consulted at every step without incurring an expense that would often swallow up the estate. Where the property is small, plain country farmers, unversed in legal niceties, are generally prevailed on by the friends to take charge of it; and from these justice requires no more than a reasonable degree of vigilance, exercised in good faith. It certainly does not require that the office of a guardian should be a trap for the simple. Here there was reasonable vigilance and good faith, and we direct the appellant to be charged with no more than his receipts."

From Woerner's "American Law of Guardianship", p. 338, § 101, we quote as follows: "The distinction between stating, rendering, or filing a guardian's account, and settling it, is in many of the States indicated by statute. Thus it is required that the guardian file his account, verified by affidavit, together with his vouchers, of which notice must be given; and if objection is made, the court must examine the vouchers and require evidence, if necessary, decreeing as may be just and entering of record its filing."

The note to the above excerpt is Code, 1886, §§ 2455–2463 (Alabama), and that section is now contained in the Code of 1923 as 8204–8211, inclusive.

The guardian's report is not ever the auditing and fixing of the rights of the wards thereunder. The decree of the court does this on the basis of the legal evidence touching the challenged and other items of the report. Cunningham v. Pool, supra.

Under our statutes, Code of 1923, §§ 8204–8211, there was no fixed rule for keeping guardianship accounts, the purpose of which is to furnish evidence of the condition of the estate that the court may correctly adjudicate the rights of the parties. In the instant case the guardian kept the accounts of all of the wards as he has here reported to the court, and by his extensive testimony explains the several items questioned by contestant, referring to the bank checks touching the same where they could be produced. The checks or vouchers on the Citizens Bank & Trust Company of Athens, which were sufficient as prima facie evidence of action and good faith in the matters covered, were produced and are not overcome by evidence on the part of contestant. So of the guardian's account in the Limestone County Bank. His inability

to produce certain of the cancelled checks touching this estate and ward was sufficiently explained and covered by the guardian's testimony and the fact of the failure of the Farmers & Merchants Bank of Athens (of which we take judicial notice) and according to the evidence the failure of delivery or destruction of certain of these checks by the state's banking authorities or administering agent of such suspended bank. There was no error of the court in admitting the checks as vouchers for the guardian.

The contestant in her own behalf says she was paid for her interest in the mortgages. She was then of full age and married and had the right in the absence of fraud or deception to so contract with her guardian as to the trust properties.

The court looks to the whole of the guardian's account to find the truth of the challenged matters. Hall v. Esslinger, supra. And if the estate is preserved the end of the statutes is attained. Williams v. Harrison, 19 Ala. 277. We have indicated that the guardian has explained sufficiently and produced the items of his accounts under the general law of evidence and such items of guardianship may likewise be proved by legal evidence. Spence v. Spence, supra; Gaunt v. Tucker's Ex'rs, 18 Ala. 27.

It results from the foregoing that the decree of the probate court is in all respects correct and it should be and it is hereby affirmed.

Affirmed.

GARDNER, C. J., and BROWN and FOSTER, JJ., concur.

